Everett Hardwood Lumber Company *v.* Calhoun (Williams, Appellant).

Argued October 28, 1935.

Before KELLER, P. J., BALDRIGE, STADTFELD, PARKER, JAMES and RHODES, JJ.

*J. Colvin Wright,* for appellant.

*Simon H. Sell,* for appellee.

OPINION BY JAMES, J., March 10, 1936:

Bernard Williams, terre tenant in the court below,

has appealed from the granting of plaintiff's motions for judgments n. o. v. in both of these appeals and as they were argued together and involve the same questions, the appeals will be disposed of in one opinion.

On April 18, 1927, judgments were entered in the Court of Common Pleas of Bedford County, Pa., against Walter G. Calhoun in favor of the Everett Hardwood Lumber Company to Nos. 371 and 372, April Term, 1927—on which date Walter G. Calhoun was the owner of certain real estate in West Providence Township, Bedford County—which judgments became liens on said real estate. On February 1, 1928, Bernard Williams purchased from Walter G. Calhoun the above real estate and received a deed which he did not record but went into actual possession of the premises on April 1, 1928. On April 18, 1932, the judgments were revived by amicable agreements against Walter G. Calhoun, individually; no writs of scire facias being issued, nor did Bernard Williams sign any agreement of revival. On December 6, 1932, writs of scire facias were issued to revive the original judgments and Bernard Williams was named as terre tenant. Affidavits of defense raising questions of law, filed by the terre tenant, were overruled and Bernard Williams filed affidavits of defense in which he alleged the facts with reference to the purchase of the land, delivery of the deed and the entry of possession by him, and that the judgments against Walter G. Calhoun were revived as to Calhoun alone. In Paragraph 5, he averred the "fact that Bernard Williams had purchased said real estate and had received a deed therefor was fully understood and known at the time by the Everett Hardwood Lumber Company," and in Paragraph 6: "The Everett Hardwood Lumber Company at that time agreed with Bernard Williams that it would release the lien of the above judgment so far as the property purchased by Bernard Williams was concerned."

Appellant contends (1) By the failure of the plaintiff to revive the judgment against the terre tenant during the period of five years from the date of the entry of the original judgment, the lien of the judgment is lost as to the land conveyed to the terre tenant, and (2) that under the facts as developed at the trial the action of the court in granting judgment n. o. v. was improper.

(1) The determination of the first question involves the interpretation of the Act of March 26, 1827, P. L. 129; Section 8 of the Act of April 16, 1849, and the Act of June 1, 1887, P. L. 289. By the Act of March 26, 1827, P. L. 129, 9 Smith's Laws 303, supplementary to the Act of 1798, 3 Sm. L. 331, it is provided: "...... and no judgment shall continue a lien on such real estate for a longer period than five years from the day on which such judgment may be entered or revived, unless revived within that period by agreement of the parties, and *terre-tenants,* filed in writing, and entered on the proper docket, or a writ of *scire facias* to revive the same be sued out within said period, according to the provisions of the act to which this is a supplement ...... nor shall the revival of such judgment by agreement as aforesaid, or the issuing of a *scire facias* either with or without entry of judgment thereon, have the effect of continuing such lien for a longer period than five years from the day on which it may be revived, as aforesaid, or such *scire facias* may have issued."

Section 8 of the Act of April 16, 1849, P. L. 663, provides as follows: "That in all cases when a judgment has been or shall be regularly revived between the original parties, the period of five years during which the lien of the judgment continues, shall only commence to run in favor of the terre tenant, from the time that he or she has placed their deed on record: *Provided,* That this act shall not apply to any cases which have been finally adjudicated, or when the terre tenant is

in actual possession of the land bound by such judg-ment, by himself or tenant." By the Act of June 1, 1887, P. L. 289, the Act of 1827, supra, was re-enacted with the following addition: "...... and no proceed-ing shall be available to continue the lien of said judg-ment against a terre-tenant, whose deed for the land bound by said judgment has been recorded, except by agreement, in writing, signed by said terre-tenant, and entered on the proper *lien* docket, or the terre-tenant, or terre-tenants, be named *as such* in the original *scire facias.*"

In Wetmore v. Wetmore, 155 Pa. 507, 26 A. 694, in passing upon the Act of 1849, Justice DEAN said: "Un-questionably, the obvious intent of this act was to con-tinue the lien of the original judgment against the land of the debtor by a revival against him alone, unless the purchaser or terre tenant put his deed upon record, or was in actual possession, in which cases the five years commenced to run in his favor from the date of the recording of the deed, or from the date he took possession of the land, personally or by his tenant. We so held in Porter v. Hitchcock, 98 Pa. 625. It was intended by that act to protect the purchaser as well as to relieve the judgment creditor from the uncer-tainty incident to the construction given the acts of 1798 and 1827. It recognizes two, and only two, kinds of notice to the judgment creditor that the land bound by the lien of his judgment has passed to another than his debtor; both notices are constructive; the one, the public record which he is presumed to know; the other, the occupancy of the land which he is presumed to see; from the date of the existence of either fact, the five years commence to run in favor of the terre tenant. This act is in the highest degree promotive of open, fair dealing; imposes hardship on no one; is a protection to creditor, debtor and purchaser." In Lyon v. Cleve-land, 170 Pa. 611, 33 A. 143, in discussing the general

principles with relation to notice on the revival of a judgment to the terre tenant, the court said: "...... But if the purchaser records his deed or enters into the actual possession of the land he becomes a holder of the land bound by the judgment, a terre tenant, of whose position and interest the judgment creditor is bound to take notice at his peril. If thereafter the plaintiff in a judgment against a vendor disregards the position of the terre tenant and revives his judgment without legal notice to him, he will lose his lien, as to lands so acquired by the terre tenant, at the end of five years from the time when the notice of the terre tenant's title can be brought home to him." Both of these cases were decided after the passage of the Act of 1887 and its effect was not discussed. In the case of Uhler v. Moses, 200 Pa. 498, 50 A. 231, the Superior Court was reversed in an opinion by Justice DEAN and it was flatly held that although the Acts of 1887 and 1849 were apparently repugnant, yet in reality no repugnancy existed and reaffirmed in principle the doctrine laid down in Wetmore v. Wetmore, supra, and Lyon v. Cleveland, supra. In Kefover v. Hustead, 294 Pa. 474, 144 A. 430, in an opinion by Justice SADLER, the doctrine as laid down in Uhler v. Moses, supra, was reaffirmed. From these cases the general rule may be found, That where a judgment is revived within five years by means of the issuance of a writ of scire facias or by an amicable agreement, such revival will bind land that has been conveyed to a terre tenant if the judgment creditor revives the judgment within five years of the recording of the deed or within five years of the taking of actual possession by the terre tenant. In the instant case, the writ of scire facias was issued within five years of the taking of the possession by the appellant, terre tenant. Suter v. Findley, 5 Pa. Superior Ct. 163—cited by appellant—was decided under the assumption that the Act of 1887 was

repugnant to the Act of April 16, 1849. This was over-ruled by Uhler v. Moses, supra. In Barrell v. Adams, 26 Pa. Superior Ct. 635, the deed of the terre tenants was on record more than seven years before the terre tenants were attempted to be brought in. In Miller Brothers v. Boyotz, 96 Pa. Superior Ct. 208, the original judgment was not revived within the period of five years. To sustain appellant's position would be in effect to reverse Uhler v. Moses, supra, which has been recognized as the law of this commonwealth for more than thirty-five years.

Appellant further argues that there is an important distinction between reviving a judgment by amicable agreement filed and by issuing a scire facias for that purpose, and relies upon Baum v. Custer, 22 W. N. C. 145, 10 Sadler 199 as authority. The facts in that case are not analogous, as the terre tenants had recorded their deed and as the facts arose prior to the Act of 1887, the decision was based on the law prior to its passage. Before the Act of 1887, there was a vital distinction between a revival of a judgment by amicable agreement and issuance of a writ of scire facias: Armstrong's App., 5 W. S. 352; McCray v. Clark, 82 Pa. 457, and was based upon the practice in force referred to in Uhler v. Moses, supra—of issuing the writ of scire facias against the original defendant alone by directing the sheriff to give notice to all terre tenants without designating them. The Act of 1887 now provides that no proceedings to continue the lien of a judgment shall avail as against a terre tenant whose deed has been recorded unless he signs the amicable agreement of revival or is named as terre tenant in the writ of scire facias. Thus the Act of 1887 effects a vital change in practice and does away in a large measure with the prior distinction between an amicable revival and a revival by the writ of scire facias. We see no ground for a distinction between an amicable

revival and a revival by the writ of scire facias since the passage of the Act of 1887.

(2)   The Everett Hardwood Lumber Company was a general partnership composed of Lesley Blackburn, A. F. Foor and Harold Blackburn, but was largely managed by Lesley Blackburn, who was also a director of the First National Bank of Everett by whom Bernard Williams was employed. In the latter part of 1927, Calhoun, original defendant, became financially involved, of which fact Williams and Blackburn had knowledge. A judgment had been entered in favor of J. L. Sponsler for $1,250; a judgment in favor of the First National Bank of Everett for $1,950; and two judgments in favor of the Everett Hardwood Lumber Company for $2,600. The judgments of Sponsler and the bank exceeded the value of the property. Prior to February 1, 1928, Williams and Lesley Blackburn had some discussions concerning the real estate involved and according to the testimony of Williams, it was understood between him and Lesley Blackburn that it would be satisfactory for Williams to purchase the property, which later he did paying the Sponsler judgment and a part of the bank judgment, and he was to be relieved from the payment of the balance of the bank judgment and also of the two judgments here involved. If such agreement had been entered into between Williams and Blackburn, we are of the opinion, as managing partner of the lumber company, Blackburn had authority to enter into such arrangement although perhaps not to the advantage of the lumber company, and if relying upon the promise to release the liens, the appellant had purchased the property, paid the Sponsler judgment and a portion of the judgment of the bank, the agreement was based upon sufficient consideration. There may even be a consideration without the accrual of any benefit at all to the promisor. If the promisee has suffered any detriment however slight,

or though he has suffered no real detriment, if he has done what he was not otherwise bound to do, in return for the promise he has given a consideration and the court will not ask whether the promisor was benefited: Weigand v. Standard Motor Co., 109 Pa. Superior Ct. 256, 262, 167 A. 493. However, upon an examination of the record, we fail to find that an agreement to release the liens had been finally concluded. The testimony of the appellant bearing on the alleged agreement is as follows: "...... Q. Mr. Williams, did you have any discussions of the financial situation of Walter G. Calhoun with Mr. Lesley Blackburn? A. Yes, sir. Q. Were these discussions prior to February 1, 1928? A. They were ...... Q. What was the ultimate result of these discussions between you and Mr. Blackburn with reference to any purchase by you of any real estate? A. We agreed it was a satisfactory transaction. Q. What would be a satisfactory transaction? A. For me to take the real estate. Q. What real estate? A. Walter G. Calhoun's in West Providence Township. Q. And what were you to do? A. Well he was to deed it to me, which he did and I was to pay this judgment of Jacob Sponsler— Q. You were to pay the Sponsler judgment in full? A. Yes, sir, I told him how much money I could get to put on it and I paid that and I paid upwards of $750 on the bank's judgment. Q. Were you to pay that on the bank's judgment? A. Yes, sir. Q. What was to happen to the remainder of the bank's judgment? A. It was to be eliminated so far as my having anything to do with it. Q. Was it to be released so far as this property was concerned? A. It was. Q. And held against Walter G. Calhoun alone? A. Yes, sir, it was to be held against him. Q. What was the situation with regard to the two judgments of the Everett Hardwood Lumber Company? A. Well there were other transactions pending by which we thought it would work out in such a manner as

they would be able to get at least part of their judgments. Q. What was to become of the two judgments so far as this particular property was concerned? Q. Was it released? A. No it wasn't, it was supposed to be. Q. I don't believe you understand. You say you were to assist in working out some other transaction in order to try to protect them? A. Yes, sir. Q. Now, in pursuance of these arrangements with Mr. Blackburn, did you buy the property from Walter G. Calhoun? A. I did. Q. Did you get a deed from him? A. Yes, sir."

When called by plaintiff as on cross-examination he had testified: "...... Q. When did you first make known to Mr. Foor or to anybody of the Everett Hardwood Lumber Company that you were the owner of that property? A. They knew it when I bought it. Q. How did they know it? A. Well Mr. Blackburn and I talked it over before I ever made the arrangements to do anything about it. Q. Before you bought it, you talked it over? A. Yes, sir. Q. What knowledge did they have that you ever bought the property? A. They knew it just as well as I did. Q. How would they know it? A. Blackburn and I talked it over and it was decided there would be a satisfactory way out of it; I needed a place to live and I arranged to take care of some of the payments ahead of their payment, and they knew it at the time we talked it over in December 1927, and if they didn't know it, it was their own fault. By the Court: What was the date notice was brought home to you that they knew you had bought? A. My understanding was they knew at the time, they knew it when I moved. Q. Had you bought it when you moved? A. Yes, sir. Q. Did you have a deed for it? A. Yes, sir. Q. When was that that you got the deed? A. Well, I would say the latter part of January or first of February of 1928, the deed was made up some time before that. Q. February or January of 1928.

A. Yes, sir, but it was discussed before that, it was [under] consideration for a couple of months before that. Q. Do you have the exact date when you got your deed? A. No, I have not. Q. Where is your deed? A. It is misplaced. Q. How did it come to be misplaced? A. I cannot tell you. By the Court: Has it ever been recorded? A. No."

This testimony was so indefinite that it would be pure conjecture to state an agreement to release the liens had actually been reached. It was dependent upon "other transactions pending" between the parties, the nature of which the record fails to disclose. Undoubtedly, there were transactions and other efforts to be carried on to minimize the loss to be suffered by the judgment creditors; but this clearly indicates that the discussions were preliminary to the final arrangements that were to be effected. These transactions were to be worked out so the judgment creditors "would be able to get at least a part of their judgments," but as to what efforts were made, if any, the record is silent and no part of the judgments was paid. Nor does the language "it was supposed to be" establish an affirmative agreement by Blackburn. Williams' supposition did not create an affirmative promise by Blackburn. After the discussions, Williams gave no notice to Blackburn that he had purchased the property or gone into possession until 1932, and no notice was given to Foor until about the time of the revival of the judgment in 1932. An agreement to release the liens of judgments must be of a precise and definite character in which no element of the agreement is to be left to conjecture or supposition. Our examination of the record fails to disclose a definite agreement on the part of Blackburn to release the liens.

Judgments affirmed.